JUDGE LYNCH

'08 CV 7062

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------ x

CHARTER TOWNSHIP OF CLINTON
POLICE AND FIRE RETIREMENT
SYSTEM, Individually and On Behalf of All
Others Similarly Situated,

                Plaintiff,

    vs.

KKR FINANCIAL HOLDINGS LLC,
SATURINO S. FANLO, DAVID A. NETJES,
JEFFREY B. VAN HORN, PAUL M.
HAZEN, R. GLENN HUBBARD, ROSS J.
KARI, WILLIAM F. ALDINGER, SCOTT C.
NUTTALL, ELY L. LICHT, DEBORAH H.
McANENY, VINCENT PAUL FINIGAN,
TRACY COLLINS and WILLY
STROTHOTTE,

                Defendants.

------------------------------------------------ x

:

Civil Action No.

CLASS ACTION

COMPLAINT FOR VIOLATION OF THE
FEDERAL SECURITIES LAWS



RECEIVED
AUG 07 2008
U.S.D.C. S.D.N.Y.
CASHIERS

DEMAND FOR JURY TRIAL

AUG 13 2008

## NATURE OF THE ACTION

1.      This is a securities class action on behalf of all persons who acquired the common stock of KKR Financial Holdings, LLC ("KFN" or the "Company") pursuant or traceable to the Company's false and misleading Registration Statement and Prospectus (collectively, the "Registration Statement") issued in connection with its May 4, 2007 merger and share issuance ("Merger"), seeking to pursue remedies under §§11 and 15 of the Securities Act of 1933 ("1933 Act"). This action asserts strict liability and negligence claims against KFN and certain of KFN's officers and directors. The Merger issued approximately 80.5 million shares of KFN to plaintiff and the other members of the Class in exchange for the same number of shares of KKR Financial Corp. ("KKR Financial"), on May 4, 2007. On that date, KFN shares closed at $26.90 per share, giving the Merger a value of $2.15 billion.

2.      KFN is a specialty finance company that invests in multiple asset classes. KFN is externally managed by KKR Financial Advisors LLC ("KKR Advisors"). KFN and KKR Advisors are affiliates of Kohlberg Kravis Roberts & Co. L.P. ("KKR"). KKR is a private equity firm that focuses primarily on late-stage leveraged buyouts. It is based in New York.

3.      The Registration Statement was false and misleading in that it misrepresented and/or omitted material facts, including:

(a)      The problematic real-estate-related assets held by the Company were a much bigger risk to the Company than the Registration Statement had represented;

(b)      The Company's capital would be insufficient given the deterioration in its portfolio which would necessitate capital preservation and the need to raise capital to the detriment of common stockholders; and

(c)      The Company was failing to adequately record loss reserves for its mortgage-related exposure, causing its balance sheet and financial results to be artificially inflated.

- 1 -

4.      During May, June and most of July 2007, KFN's stock traded above $25 per share. In late July, many mortgage-related companies' stock prices declined, including KFN's. Nevertheless, KFN's stock closed at $18.02 per share on August 13, 2007.

5.      Then, on August 15, 2007, KFN shocked the financial markets when it issued a release which revealed that KFN would be selling $5.1 billion in mortgage backed securities at a loss. The release stated:

> KKR Financial Holdings LLC ("KFN" or the "Company") today announced the sale of approximately $5.1 billion of residential mortgage loans. Prior to the Company's conversion from a real estate investment trust ("REIT") to a limited liability company in May 2007, KFN invested in residential real estate assets in order to satisfy the requirements to be treated as a REIT for U.S. federal income tax purposes. As a REIT, at least 75% of the Company's gross income had to be generated by real estate assets, which for the Company consisted of its investments in residential mortgage assets. In order to meet this requirement, the Company sought to limit its exposure to both interest rate risk and credit risk by investing in floating rate and hybrid rate assets that were hedged with interest rate derivatives and by investing in residential mortgage assets with high credit quality due to the underlying collateral having a weighted average FICO® score of 728 and a weighted average loan-to-value ratio of 71%.
>
> As previously announced, the Company no longer intends to invest in residential real estate assets and it intends to dispose of its existing portfolio through either a run-off of the assets through principal payments and prepayments or through a strategic alternative, including actively pursuing the sale of the common stock of its REIT subsidiary.
>
> The Company recently sold $5.1 billion of its residential mortgage assets and terminated related interest rate swaps, which sale will result in a net loss of approximately $40.0 million. After the sale, the Company owns approximately $5.8 billion of mortgage loans primarily in the form of residential mortgage-backed securities. The Company currently finances approximately $5.3 billion of its remaining residential mortgage-backed securities portfolio through non-recourse asset-backed secured liquidity note facilities, and the Company currently has an aggregate net equity investment in such facilities totaling approximately $200.0 million. Due to the unprecedented disruption in the residential mortgage and global commercial paper markets, the Company has initiated discussions with the investors in its asset-backed secured liquidity note facilities regarding various alternatives to resolve potential funding disruptions resulting from the current market environment. In connection with the execution of or failure to execute any of the strategies discussed in this press release, the Company presently estimates that it may need to record a charge of up to the amount of its approximately ***$200.00 million net equity***

*investment* in the asset-backed liquidity note facilities described above and additional liabilities in an estimated range of $0 to $50.0 million. No assurance can be made that any of the strategies being evaluated by the Company will be successfully executed. In light of the level of disruption and volatility in commercial paper and broader credit markets, estimates of potential exposure are necessarily subject to future revision.

6.     When this shocking news was revealed, KFN's stock price collapsed to as low as $9.39 per share, eventually closing at $10.52 per share, a decline from the prior day of 31% on trading volume of 21 million shares, or 16 times of the average daily trading volume for KFN stock. KFN shares currently trade for approximately $10 per share, a 63% decline from the $26.90 per share at which they were sold to plaintiff and the Class.

## JURISDICTION AND VENUE

7.     The claims asserted herein arise under and pursuant to §§11 and 15 of the 1933 Act [15 U.S.C. §§77k and 77o].

8.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and §22 of the 1933 Act.

9.     Venue is proper in this District pursuant to 28 U.S.C. §1391(b), because many of the acts and practices complained of herein occurred in substantial part in this District and certain of the defendants reside in this District.

10.     In connection with the acts alleged in this complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the national securities markets.

## PARTIES

11.     Plaintiff Charter Township of Clinton Police and Fire Retirement System purchased 2,975 shares of KFN common stock pursuant or traceable to the Merger, as set forth in the accompanying certification, and has been damaged thereby.

- 3 -

12.    Defendant KFN is a specialty finance company. KFN operates offices around the globe and in New York.

13.    Defendant Saturino S. Fanlo ("Fanlo") has been a director and Chief Executive Officer ("CFO") of the Company since the Company's Merger in May 2007. Previous to the Company's reorganization, Fanlo served as director and CEO of KKR Financial and as CEO of KKR Advisors. Fanlo continues to serve as CEO of KKR Advisors. Fanlo signed or authorized the signing of the false and misleading Registration Statement.

14.    Defendant David A. Netjes ("Netjes") has been Chief Operating Officer ("COO") of the Company since the Company's Merger in May 2007. Previous to the Company's reorganization, Netjes was COO of KKR Financial and KKR Advisors. Netjes continues to serve as COO of KKR Advisors. Netjes signed or authorized the false and misleading Registration Statement.

15.    Defendant Jeffrey B. Van Horn ("Van Horn") has been Chief Financial Officer ("CFO") of KFN since the Company's Merger in May 2007. Previous to the Company's reorganization, Van Horn was CFO of KKR Financial. Van Horn signed or authorized the signing of the false and misleading Registration Statement.

16.    Defendant Paul M. Hazen ("Hazen") has been Chairman of KFN's Board of Directors since the Company's Merger in May 2007. Previous to the Company's reorganization, Hazen was Chairman of KKR Financial. Hazen was a director of KFN at the time of the Merger.

17.    Defendant R. Glenn Hubbard ("Hubbard") has been a director of KFN since the Company's Merger in May 2007. Previous to the Company's reorganization, Hubbard was a director of KKR Financial. Hubbard was a director of KFN at the time of the Merger.

18.     Defendant Ross J. Kari ("Kari") has been a director of KFN since the Company's Merger in May 2007. Previous to the Company's reorganization, Kari was a director of KKR Financial. Kari was a director of KFN at the time of the Merger.

19.     Defendant William F. Aldinger ("Aldinger") has been a director of KFN since the Company's Merger in May 2007. Previous to the Company's reorganization, Aldinger was a director of KKR Financial. Aldinger was a director of KFN at the time of the Merger.

20.     Defendant Scott C. Nuttall ("Nuttall") has been a director of KFN since the Company's Merger in May 2007. Previous to the Company's reorganization, Nuttall was a director of KKR Financial. Nuttall was a director of KFN at the time of the Merger.

21.     Defendant Ely L. Licht ("Licht") has been a director of KFN since the Company's Merger in May 2007. Previous to the Company's reorganization, Licht was a director of KKR Financial. Licht was a director of KFN at the time of the Merger.

22.     Defendant Deborah H. McAneny ("McAneny") has been a director of KFN since the Company's Merger in May 2007. Previous to the Company's reorganization, McAneny was a director of KKR Financial. McAneny was a director of KFN at the time of the Merger.

23.     Defendant Vincent Paul Finigan ("Finigan") has been a director of KFN since the Company's Merger in May 2007. Previous to the Company's reorganization, Finigan was a director of KKR Financial. Finigan was a director of KFN at the time of the merger.

24.     Defendant Tracy Collins ("Collins") has been a director of KFN since the Company's Merger in May 2007. Previous to the Company's reorganization, Collins was a director of KKR Financial. Collins was a director of KFN at the time of the Merger.

25.     Defendant Willy Strothotte ("Strothotte") has been a director of KFN since the Company's Merger in May 2007. Previous to the Company's reorganization, Strothotte was a director of KKR Financial. Strothotte was a director of KFN at the time of the Merger.

26.     The defendants referenced above in ¶¶13-25 are referred to herein as the "Individual Defendants."

## CLASS ACTION ALLEGATIONS

27.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all persons or entities who acquired shares of KFN common stock pursuant or traceable to the Company's false and misleading Registration Statement and were damaged thereby (the "Class"). Excluded from the Class are defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

28.     The members of the Class are so numerous that joinder of all members is impracticable. While the exact number of Class members is unknown to plaintiff at this time and can only be ascertained through appropriate discovery, plaintiff believes that there are hundreds, if not thousands, of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by KFN or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions. KFN has more than 150 million shares of stock outstanding.

29.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein.

- 6 -

30.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

31.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a)     whether the 1933 Act was violated by defendants' acts as alleged herein;

(b)     whether statements made by defendants to the investing public in the Registration Statement misrepresented material facts about the business, operations and/or management of KFN; and

(c)     to what extent the members of the Class have sustained damages and the proper measure of damages.

32.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

### THE FALSE AND MISLEADING REGISTRATION STATEMENT

33.     On or about April 2, 2007, KFN filed with the SEC a Form S-4/A (the "Registration Statement") for the Merger, which became effective on April 2, 2007. KKR Financial's shareholders were asked to approve the Merger. The shareholders approved the Merger at KKR Financial's annual meeting held on May 3, 2007. The Merger was completed on May 4, 2007, with the Company exchanging 80.5 million shares of KFN for the same number of shares of KKR Financial.

34.    The Registration Statement was negligently prepared and, as a result, contained untrue statements of material facts or omitted to state other facts necessary to make the statements made not misleading and was not prepared in accordance with the rules and regulations governing its preparation.

35.    The Registration Statement made the following representations regarding KFN's business and operations, including its mortgage-related activities following the Merger:

### OUR BUSINESS AFTER THE CONVERSION TRANSACTION

We expect that the conversion transaction will provide us with the flexibility over time to take the capital that we currently invest in real estate investments and reallocate the capital to non-real estate investments. After the conversion transaction, we intend to *over time* allocate significantly more capital to non-real estate investments that we believe may have a higher ROE.

We currently are required to invest in real estate investments in order to qualify as a REIT for U.S. federal income tax purposes and to maintain our exemption from regulation under the 1940 Act. Since our formation in 2004, we have fulfilled such requirements by investing principally in residential real estate investments. After the completion of the conversion transaction, we expect that we will only purchase additional residential real estate investments if we believe that our risk and ROE requirements are achieved.

*                *                *

*As of December 31, 2006, we estimate that approximately 35% of our raised equity capital (calculated as described below) was invested in residential real estate investments, approximately 50% of our raised equity capital was invested in non-real estate investments*, excluding marketable and non-marketable equity securities, and approximately 15% of our raised equity capital was invested in marketable and non-marketable equity securities, including our private equity investments. We currently invest in residential real estate investments so that we can comply with the U.S. federal income tax requirements applicable to REITs and to maintain our exemption from regulation under the 1940 Act. For the quarter ended December 31, 2006, our annualized return on raised equity capital invested in residential real estate investments was approximately 8% and our annualized return on raised equity capital invested in our non-real estate investments, excluding marketable and non-marketable equity securities, was approximately 20%. Since our inception and through December 31, 2006, we have not realized any gains, losses, or income on our non-marketable equity security investments which are comprised primarily of private equity investments. For purposes of calculating our returns on raised equity capital we included (i) net investment income, (ii) net interest income earned on investments

financed using total rate of return swaps, and (iii) equity in net investment income of unconsolidated affiliate, and excluded (i) other income, gains and losses, (ii) non-investment expenses (other than loan servicing expense) and (iii) income tax expense. Furthermore, in our calculation of returns on raised equity capital we (i) estimated the amount of raised equity capital allocated to each asset class based on the amount of equity invested in such asset class or dedicated to such asset class and (ii) utilized a total raised equity capital amount of approximately $1.6 billion, which is the aggregate net proceeds that we received in connection with our initial private placement of common stock in August 2004 and our initial public offering of common stock in June 2005. Our calculation of allocated capital and returns on raised equity capital are subject to a number of estimates and assumptions. In particular, the amount of raised equity capital that we allocated to each asset class is estimated and the foregoing estimated percentage returns on raised equity capital would have been different, perhaps substantially, if a different allocation had been made. Furthermore, our historic returns on raised equity capital are not indicative of future returns on raised equity capital.

We are evaluating various alternatives to reducing our real estate investments after the conversion transaction, including allowing our real estate assets to pay down in the ordinary course, selling KKR Financial Corp. or selling all or a portion of KKR Financial Corp.'s real estate assets. If we allow our real estate assets to liquidate in the ordinary course, we expect that the reallocation of capital will occur over three or four years as our residential real estate investments pay down as a result of both scheduled amortization and prepayments. Estimating the prepayment rates on our residential real estate investments is very difficult because of factors that we can not control or accurately predict such as future interest rates and future housing prices. As a result, the reallocation of capital from our residential real estate investments to our non-real estate investments may take longer than we expect, absent other liquidation strategies. We will also consider selling KKR Financial Corp. or all of or a portion of KKR Financial Corp.'s real estate assets after the completion of the conversion transaction. The sale of KKR Financial Corp.'s real estate assets will result in a loss. *As of December 31, 2006, the carrying value of our real estate assets exceeded the estimated fair value for those real estate assets by $49.9 million.* However, if we sell certain of the real estate assets, we would no longer be able to designate, for U.S. federal income tax purposes, certain of our interest rate derivatives as hedges of the financings used to acquire or hold the related real estate assets. As a result, KKR Financial Corp. would have to recognize the unrealized gains on such interest rate derivatives for U.S. federal income tax purposes as ordinary income even though KKR Financial Corp. did not terminate such interest rate derivative contracts. As of December 31, 2006, we had estimated unrealized gains of $50.8 million on those interest rate derivatives that, if terminated and thereby realized for U.S. federal income tax purposes, we believe could cause KKR Financial Corp. to fail one or more of the REIT tax qualification provisions. Any such ordinary income recognized by KKR Financial Corp. would also be non-cash, or "phantom," income that could increase its required distributions to us and the amount of income allocated to our shareholders. As a result, it may be difficult to either sell our residential real estate investments or terminate the related financings

- 9 -

and hedges because of U.S. federal income tax consequences that may be potentially adverse to us and our shareholders.

36.    The Registration Statement incorporated by reference KKR Financial's 10-K for the year ending December 31, 2006, filed with the SEC on February 23, 2007. KKR Financial's 10-K made the following representations regarding its business and operations, including the value of KKR Financial's real estate as of December 31, 2006:

**Executive Overview**

We are a specialty finance company that invests in multiple asset classes and uses leverage with objective of generating competitive risk-adjusted returns subject to maintaining our status as a real estate investment trust ("REIT") under the Internal Revenue Code of 1986, as amended (the "Code"), and our exemption from regulation under the Investment Company Act of 1940, as amended (the "Investment Company Act"). Our objective is to provide competitive returns to our investors through a combination of distributions and capital appreciation. As part of our multi-asset class strategy, we seek to invest opportunistically in those asset classes that can generate competitive leveraged risk-adjusted returns. Investing in multiple asset classes does not, however, reduce or eliminate many of the risks associated with our investment portfolio such as geographic concentration risk, asset class concentration risk, market risk and credit risk. We currently make investments in the following asset classes: (i) residential mortgage loans and mortgage-backed securities; (ii) corporate loans and debt securities; (iii) commercial real estate loans and debt securities; (iv) asset-backed securities; and (v) marketable and non-marketable equity securities. We also make opportunistic investments in other asset classes from time to time. Our investment guidelines do not impose any limitations on the amount of our investments in any specific asset class, industry, or investment. Our income is generated primarily from the difference between the interest and dividend income earned on our investments and the cost of our borrowings, plus (i) realized and unrealized gains and losses on its derivatives that are not accounted for as hedges, (ii) realized gains and losses from the sales of investments, and (iii) fee income.

\*        \*        \*

Our board of directors has approved a restructuring transaction (the "Conversion Transaction") whereby KKR Financial Corp., currently a publicly traded Maryland corporation, would become a subsidiary of a recently formed Delaware limited liability company that would be publicly traded. The Delaware limited liability company, named KKR Financial Holdings LLC, will not be taxed as a REIT, but is intended to be a pass-through entity for U.S. federal income tax purposes. The Conversion Transaction would result in each share of currently issued and outstanding KKR Financial Corp. common stock being converted into an equal number of limited liability company shares in KKR Financial Holdings LLC. The

Conversion Transaction is subject to shareholder approval and if approved, we expect that it will be completed by June 30, 2007.

*    *    *

### *Investment Portfolio*

As of December 31, 2006, our investment portfolio totaled $17.1 billion, representing an increase of 14% from $15.0 billion as of December 31, 2005. *As of December 31, 2006, our investment portfolio primarily consisted of residential mortgage loans and securities totaling $12.6 billion*, corporate loans and securities totaling $4.1 billion, commercial real estate loans and securities totaling $140.7 million, and marketable equity securities consisting of preferred and common stock totaling $69.0 million. In addition, our investment portfolio included investments in non-marketable equity securities totaling $166.3 million as of December 31, 2006.

*    *    *

### *Impairments*

We evaluate our investment portfolio for impairment as of each quarter end or more frequently if we become aware of any material information that would lead us to believe that an investment may be impaired. We evaluate whether the investment is considered impaired and whether the impairment is other-than-temporary. If we make a determination that the impairment is other-than-temporary, we recognize an impairment loss equal to the difference between the amortized cost basis and the estimated fair value of the investment. . . .

### *Allowance for Loan Losses*

We maintain an allowance for loan losses at a level that we believe is adequate based on an evaluation of known and inherent risks related to our loan investments. When determining the adequacy of the allowance for loan losses we consider historical and industry loss experience, economic conditions and trends, the estimated fair values of our loans, credit quality trends and other factors that we determine are relevant. Loans are generally evaluated for impairment individually, but loans purchased on a pooled basis with relatively smaller balances and substantially similar characteristics may be evaluated collectively for impairment. Our allowance for loan losses consists of an allocated component and an unallocated component. The allocated component of our allowance for loan losses reflects our estimate of losses on individual loans and our unallocated component reflects our estimate of losses on pools or groups of similar loans.

*    *    *

Currently, our residential mortgage loans are relatively homogeneous and the adequacy of the allowance for loan losses is based on a review of relevant factors including, but not limited to, estimated fair values, industry statistics, current

economic conditions, loan portfolio composition, estimated fair values and quality of collateral, delinquency trends and credit losses realized to-date on underlying loans. Two critical assumptions used in estimating the loan loss reserves for the residential mortgage loan portfolio are an assumed rate of default, which is the expected rate at which loans go into foreclosure over their life, and an assumed rate of loss severity, which represents the expected rate of realized loss upon disposition of the properties that have gone into foreclosure.

*As of December 31, 2006, our allowance for loan losses totaled $1.5 million which we have determined as being adequate for estimated losses inherent in our loan investments as of that date.*

37.     On May 4, 2007, KFN issued a press release entitled "KKR Financial Holdings LLC Announces Completion of Restructuring and Declares Quarterly Distribution." The press release provided in pertinent part:

KKR Financial Holdings LLC announced today the completion of the restructuring transaction whereby KKR Financial Corp., a publicly traded Maryland corporation, has become a wholly-owned subsidiary of KKR Financial Holdings LLC, a recently formed Delaware limited liability company. All outstanding shares of KKR Financial Corp. common stock were converted into shares representing limited liability company interests, or shares, in KKR Financial Holdings LLC. KKR Financial Holdings LLC shares are listed and trade on the New York Stock Exchange under the ticker symbol "KFN".

KKR Financial Holdings LLC also announced today that its Board of Directors has declared a cash distribution for the quarter ended March 31, 2007 of $0.56 per share. The cash distribution will be payable on May 31, 2007 to holders of shares of record as of the close of business on May 17, 2007.

38.     The true facts, which were omitted from the Registration Statement, were:

(a)     The problematic real-estate-related assets held by the Company were a much bigger risk to the Company than the Registration Statement had represented;

(b)     The Company's capital would be insufficient given the deterioration in its portfolio which would necessitate capital preservation and the need to raise capital to the detriment of common stockholders; and

(c)     The Company was failing to adequately record loss reserves for its mortgage-related exposure, causing its balance sheet and financial results to be artificially inflated.

- 12 -

39.    During May, June and most of July 2007, KFN's stock traded above $25 per share. In late July, many mortgage-related companies' stock prices declined, including KFN's. Nevertheless, KFN's stock closed at $18.02 per share on August 13, 2007.

40.    Then, on August 15, 2007, KFN shocked the financial markets when it issued a release which revealed that KFN would be selling $5.1 billion in mortgage backed securities at a loss. The release stated:

> KKR Financial Holdings LLC ("KFN" or the "Company") today announced the sale of approximately $5.1 billion of residential mortgage loans. Prior to the Company's conversion from a real estate investment trust ("REIT") to a limited liability company in May 2007, KFN invested in residential real estate assets in order to satisfy the requirements to be treated as a REIT for U.S. federal income tax purposes. As a REIT, at least 75% of the Company's gross income had to be generated by real estate assets, which for the Company consisted of its investments in residential mortgage assets. In order to meet this requirement, the Company sought to limit its exposure to both interest rate risk and credit risk by investing in floating rate and hybrid rate assets that were hedged with interest rate derivatives and by investing in residential mortgage assets with high credit quality due to the underlying collateral having a weighted average FICO® score of 728 and a weighted average loan-to-value ratio of 71%.
>
> As previously announced, the Company no longer intends to invest in residential real estate assets and it intends to dispose of its existing portfolio through either a run-off of the assets through principal payments and prepayments or through a strategic alternative, including actively pursuing the sale of the common stock of its REIT subsidiary.
>
> The Company recently sold $5.1 billion of its residential mortgage assets and terminated related interest rate swaps, which sale will result in a net loss of approximately $40.0 million. After the sale, the Company owns approximately $5.8 billion of mortgage loans primarily in the form of residential mortgage-backed securities. The Company currently finances approximately $5.3 billion of its remaining residential mortgage-backed securities portfolio through non-recourse asset-backed secured liquidity note facilities, and the Company currently has an aggregate net equity investment in such facilities totaling approximately $200.0 million. Due to the unprecedented disruption in the residential mortgage and global commercial paper markets, the Company has initiated discussions with the investors in its asset-backed secured liquidity note facilities regarding various alternatives to resolve potential funding disruptions resulting from the current market environment. In connection with the execution of or failure to execute any of the strategies discussed in this press release, the Company presently estimates that it may need to record a charge of up to the amount of its approximately *$200.00 million net equity*

*investment* in the asset-backed liquidity note facilities described above and additional liabilities in an estimated range of $0 to $50.0 million. No assurance can be made that any of the strategies being evaluated by the Company will be successfully executed. In light of the level of disruption and volatility in commercial paper and broader credit markets, estimates of potential exposure are necessarily subject to future revision.

41.     When this shocking news was revealed, KFN's stock price collapsed to as low as $9.39 per share, eventually closing at $10.52 per share, a decline from the prior day of 31% on trading volume of 21 million shares, or 16 times of the average daily trading volume for KFN stock. KFN shares currently trade for approximately $10 per share, a 63% decline from the $26.90 per share at which they were sold to plaintiff and the Class.

## COUNT I

### Violations of Section 11 of the 1933 Act
### Against All Defendants

42.     This Count is brought pursuant to §11 of the 1933 Act, 15 U.S.C. §77k, on behalf of the Class, against all defendants.

43.     Plaintiff incorporates by reference the above paragraphs, as if set forth herein, except any allegation of fraud, recklessness or intentional misconduct. This Count is asserted against all defendants.

44.     KFN is the issuer of the stock sold via the Registration Statement. The Individual Defendants are signatories or authorizers of the Registration Statement.

45.     KFN is absolutely liable for the material misstatements in and omissions from the Registration Statement.

46.     The other defendants owed purchasers of the stock the duty to make a reasonable investigation of the statements contained in the Registration Statement to ensure that said statements were true and that there was no omission to state any material fact required to be stated in order to make the statements contained therein not misleading. These defendants knew or, in the exercise of

- 14 -

reasonable care, should have known of the material misstatements and omissions contained in the Registration Statement as set forth herein. None of these defendants made a reasonable investigation or possessed reasonable grounds for the belief that statements contained in the Registration Statement and Prospectus were true or that there was not any omission of material fact necessary to make the statements made therein not misleading.

47.     As signatories or authorizers of the Registration Statement, directors, officers of KFN or controlling persons of the issuer, the defendants owed the purchasers of KFN common stock, including plaintiff and the Class, the duty to make a reasonable and diligent investigation of the statements contained in the Registration Statement/Prospectus at the time that it became effective, to ensure that said statements were true and that there was no omission to state a material fact required to be stated in order to make the statements contained therein not misleading. Defendants knew or, in the exercise of reasonable care, should have known of the material misstatements and omissions contained in the Registration Statement and Prospectus as set forth herein. As such, defendants are liable to plaintiff and the Class.

48.     By reason of the conduct herein alleged, each defendant violated, and/or controlled a person who violated, §11 of the 1933 Act. As a direct and proximate result of defendants' wrongful conduct, the market price for KFN common stock was artificially inflated in the IPO, and plaintiff and the Class suffered substantial damages in connection with the purchase thereof. Plaintiff and the Class all purchased KFN stock issued pursuant and/or traceable to the Registration Statement.

49.     Plaintiff and other members of the Class purchased or otherwise acquired their KFN common stock without knowledge of the untruths or omissions alleged herein. Plaintiff and the other members of the Class were thus damaged by defendants' misconduct and by the material misstatements and omissions in the Registration Statement.

50.    At the time of their purchases of KFN shares, plaintiff and other members of the Class were without knowledge of the facts concerning the wrongful conduct alleged herein and could not have reasonably discovered those facts prior to August 15, 2007. Less than one year has elapsed from the time that plaintiff discovered or reasonably could have discovered the facts upon which this complaint is based to the time that plaintiff filed this complaint. Less than three years has elapsed between the time that the securities upon which this Count is brought were offered to the public and the time plaintiff filed this complaint.

### COUNT II

#### Violations of Section 15 of the 1933 Act Against the Individual Defendants

51.    Plaintiff incorporates by reference the above paragraphs, as if set forth herein, except any allegation of fraud, recklessness or intentional misconduct. This Count is asserted against the Individual Defendants.

52.    Each of the defendants named herein acted as a controlling person of the Company within the meaning of §15 of the 1933 Act. The Individual Defendants were each senior officers and/or directors of KFN charged within the legal responsibility of overseeing its operations. Each controlling person had the power to influence and exercised the same to cause his or her controlled person to engage in the unlawful acts and conduct complained of herein.

53.    By reason of such conduct, the defendants named in this Count are liable pursuant to §15 of the 1933 Act. As a direct and proximate result of their wrongful conduct, plaintiff and the other members of the Class suffered damages in connection with their purchases of the Company's common stock.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff prays for relief and judgment, as follows:

A.     Determining that this action is a proper class action and certifying plaintiff as a class representative under Rule 23 of the Federal Rules of Civil Procedure;

B.     Awarding compensatory damages in favor of plaintiff and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.     Awarding plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees;

D.     Awarding rescission or a rescissory measure of damages; and

E.     Such equitable/injunctive or other relief as deemed appropriate by the Court.

## JURY DEMAND

Plaintiff hereby demands a trial by jury

DATED:  August 7, 2008                      COUGHLIN STOIA GELLER
                                              RUDMAN & ROBBINS LLP
                                            SAMUEL H. RUDMAN
                                            DAVID A. ROSENFELD


                                            _____
                                                    SAMUEL H. RUDMAN

                                            58 South Service Road, Suite 200
                                            Melville, NY  11747
                                            Telephone: 631/367-7100
                                            631/367-1173 (fax)

- 17 -

COUGHLIN STOIA GELLER
  RUDMAN & ROBBINS LLP
DARREN J. ROBBINS
DAVID C. WALTON
CATHERINE J. KOWALEWSKI
655 West Broadway, Suite 1900
San Diego, CA  92101-3301
Telephone:  619/231-1058
619/231-7423 (fax)

Attorneys for Plaintiff

## CERTIFICATION OF NAMED PLAINTIFF
## PURSUANT TO FEDERAL SECURITIES LAWS

CHARTER TOWNSHIP OF CLINTON POLICE AND FIRE RETIREMENT SYSTEM ("Plaintiff") declares:

1.    Plaintiff has reviewed a complaint and authorized its filing.

2.    Plaintiff did not acquire the security that is the subject of this action at the direction of plaintiff's counsel or in order to participate in this private action or any other litigation under the federal securities laws.

3.    Plaintiff is willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary.

4.    Plaintiff has made the following transaction(s) during the Class Period in the securities that are the subject of this action:

| Security | Transaction | Date | Price Per Share |
| --- | --- | --- | --- |

*See* attached Schedule A.

5.    Plaintiff has not sought to serve or served as a representative party for a class in an action filed under the federal securities laws except as detailed below during the three years prior to the date of this Certification:

*In re Prestige Brands Holdings, Inc. Sec. Litig.*, No. 7:05-cv-06924-CLB (S.D.N.Y.)
*Archdiocese of Milwaukee Supporting Fund, Inc. v. Mercury Interactive Corp., et al.*, No. C-05-3395-JF (N.D. Cal.)

6.    The Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond the Plaintiff's pro rata share of any recovery,

KKR FINANCIAL

except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the court.

I declare under penalty of perjury that the foregoing is true and correct. Executed this ___7___ day of ___AUGUST___, 2008.

CHARTER TOWNSHIP OF CLINTON
POLICE AND FIRE RETIREMENT
SYSTEM.

By: _____

Its: ___CHAIRMAN_____

- 2 -

KKR FINANCIAL

SCHEDULE A

SECURITIES TRANSACTIONS

**Acquisitions**

| Date<br>Acquired | Type/Amount of<br>Securities Acquired | Price |
|---|---|---|
| 05/04/2007 | 2,975 | $26.55 |
| 10/05/2007 | 578 | $14.40 |
| 10/22/2007 | 200 | $16.21 |
| 04/03/2008 | 1,000 | $12.14 |

**Sales**

| Date<br>Sold | Type/Amount of<br>Securities Sold | Price |
|---|---|---|
| 09/24/2007 | 1,600 | $16.75 |
| 10/26/2007 | 200 | $15.69 |
| 07/29/2008 | 25 | $10.06 |