USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: November 17, 2010

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------x

CHARTER TOWNSHIP OF CLINTON          :
POLICE AND FIRE RETIREMENT
SYSTEM, Individually and On Behalf of   :
All Others Similarly Situated,
                                       :               08 Civ. 7062 (PAC)
                Plaintiff,              :
                                                       OPINION AND ORDER
                                       :
        -against-                       :

KKR FINANCIAL HOLDINGS LLC, et al.,    :
                Defendants.             :
                                       :
--------------------------------------------------------x

HONORABLE PAUL A. CROTTY, United States District Judge:

Defendants move, pursuant to Fed. R. Civ. P. 12(b)(6), to dismiss Charter Township of

Clinton Police and Retirement System's[1] ("Plaintiff") securities class action against Defendants

KKR Financial Holdings LLC ("KFN") and three of its current and former officers and directors

("Individual Defendants"), asserting claims under Sections 11 and 15 of the Securities Act of

1933, 15 U.S.C. §§ 77k, 77o.[2]  KFN's predecessor, KKR Financial Corp. ("KKR Financial"),[3]

operated as a real estate investment trust ("REIT").[4]  As a REIT, KKR Financial was heavily

invested in real estate.  KKR Financial underwent a corporate reorganization in 2007 in order to

diversify its holdings and decrease its real estate related investments.  On April 2, 2007, KFN

---

[1] While the caption on the brief in opposition to the motion to dismiss was submitted in the name of Charter
Township of Clinton Police and Fire Retirement System, that entity is not the lead plaintiff.  Indeed, Charter Police
and Fire Retirement System never moved to be appointed lead plaintiff.  The same law firm represents St. Clair
Shores Police and Fire Retirement System, which was appointed the lead plaintiff, pursuant to the Private Securities
Litigation Reform Act of 1995, 15 U.S.C. § 78 U-4.  Plaintiff's counsel admits that the complaint "inadvertently
listed Charter as the Plaintiff."  See Rudman Letter, October 12, 2010.
[2] The Individual Defendants are Saturnino S. Fanlo ("Fanlo"), David A. Netjes ("Netjes") and Jeffrey B. Van Horn
("Van Horn").
[3] At times, KKR Financial and KFN will be jointly referred to as "the Company."
[4] Plaintiff filed its amended complaint on April 27, 2009.  The case was initially assigned to Judge Lynch, but was
transferred to this Court on October 1, 2009.

issued a registration statement offering to exchange its securities for those of the publicly traded KKR Financial.  After the share exchange, KFN became a publicly held company with KKR Financial as its subsidiary.  In August, 2007, approximately four months after the registration statement became effective, KFN announced that due to disruptions in the residential mortgage and commercial paper markets, it had been forced to sell billions of dollars of real estate assets at a loss, and was exposed to hundreds of millions of dollars of other potential losses.  The price of KFN stock declined substantially.  Plaintiff's primary contentions are that the April registration statement failed to disclose material facts regarding KFN's exposure to losses in the asset backed commercial paper ("ABCP") market; and included financial statements which were not prepared in accordance with Generally Accepted Accounting Principles ("GAAP").  Plaintiff's Section 11 claim is alleged against all Defendants.  Plaintiff's Section 15 complaint is asserted only against the Individual Defendants.

In support of its motion to dismiss, Defendants contend that the registration statement does not contain any misstatements or omissions, and even if it did, any misstatements or omissions were, as a matter of law, immaterial.  Defendants contend that the complaint is a textbook example of hindsight pleading.

For the reasons that follow, the Defendants' motion to dismiss is GRANTED.  In its briefing on the motion to dismiss, Plaintiff does not challenge, and apparently concedes, that many of the omissions alleged in the Amended Complaint are not actionable.  The alleged omissions and failings Plaintiff relies on in responding to the Rule 12(b)(6) motion are derived solely from hindsight and fail to state a viable Section 11 claim.  Since Section 15 liability is derivative of Section 11 liability, the entire Amended Complaint must be dismissed.

**A.      Facts[5] as Alleged in Complaint and SEC Filed Documents**

KFN's predecessor, KKR Financial, was founded by Fanlo and Netjes in 2004 and went

public in 2005.  (Amended Complaint ("Am. Compl.") ¶ 22.)  Since its inception, KKR

Financial operated as a REIT.  (KKR Financial Holdings LLC Form S-4/A filed April 2, 2007

("Registration Statement") at 4-5, Declaration of Michael J. Chepiga ("Chepiga Decl."), Ex. A.)

The company was engaged in various lines of business, including corporate lending and

commercial real estate finance. (Am. Compl. ¶ 22.)  KKR Financial also invested in debt and

equity securities, as well as residential mortgage loans and residential mortgage backed securities

("RMBS").  (Id.)  Since KKR Financial was a REIT, at the end of each calendar quarter at least

75% of its assets were required to be "real estate assets" as defined in the Internal Revenue Code

and each year 75% of its gross income had to be derived from real estate sources.  (KKR

Financial Corp. 2006 Form 10-K ("2006 Form 10-K") at 68, Chepiga Decl., Ex. B.)

In 2005 and 2006, KKR Financial made significant investments in "jumbo mortgage

loans" and "no documentation mortgage loans."  (Am. Compl. ¶ 24.)  So-called "jumbo" and

"no-doc" mortgages are both types of "non-conforming mortgage loans."  (Id.)  A "conforming

mortgage loan" meets the standards required for purchase by the Federal National Mortgage

Association ("Fannie Mae") and the Federal Home Loan Mortgage Corporation ("Freddie

Mac"), see David Schmudde, Responding to the Subprime Mess: The New Regulatory

Landscape, 14 Fordham J. Corp. & Fin. L. 709, 716 (2009), while a non-conforming mortgage

---

[5] In ruling on a motion to dismiss, courts accept the facts alleged in the complaint as true and "may consider any written instrument attached to the complaint, statements or documents incorporated into the complaint by reference, legally required public disclosure documents filed with the SEC, and documents possessed by or known to the plaintiff and upon which it relied in bringing the suit."  ATSI Commc'ns, Inc. v. Shaar Fund, Ltd., 493 F.3d 87, 98 (2d Cir 2007).  Courts also consider "matters of which judicial notice may be taken."  Leonard F. v. Israel Disc. Bank of N.Y., 199 F.3d 99, 107 (2d Cir. 1999).  The facts are taken from the Amended Complaint, the documents referenced therein, various public filings made by KFN and KKR Financial with the Securities and Exchange Commission ("SEC"), and facts subject to judicial notice.  The Court issued an Order on October 4, 2010 that it would not consider certain exhibits submitted by Defendants because they were extraneous to the complaint.

loan does not. "Jumbo mortgages" have loan balances in excess of the purchasing authority of

Fannie Mae and Freddie Mac. See In re Cmty. Bank of N. Va., 418 F.3d 277, 284 (3d Cir.

2005). "No-doc mortgages" lack the underwriting documentation needed to qualify as

conforming mortgage loans. (Am. Comp. ¶ 24.) KKR Financial also invested in, and held,

"non-agency RMBS." Non-agency RMBS are not guaranteed by federally chartered entities

such as Fannie Mae and Freddie Mac. (Registration Statement at 34-35.)

According to the Amended Complaint, "[d]uring 2006, [KKR Financial] reported $12.6

billion in residential mortgage loans and RMBS investments." (Am. Compl. ¶ 24.) KKR

Financial would securitize its investments in residential mortgage loans and hold the securities.

(Id. at ¶ 24 n.1.) The residential mortgages invested in by KKR Financial were not "sub-prime."

Defendants point out that as of December 31, 2006, 98% of the RMBS held by KKR Financial

were rated AAA by Standard & Poor's and the company's portfolio did not contain any loans to

sub-prime borrowers. (2006 Form 10-K at 56-57.) [6] KKR Financial's 2006 Form 10-K states:

> We expect that a material portion of our investment portfolio of residential
> mortgage loans and RMBS will consist of, or in the case of RMBS be backed by,
> non-conforming residential mortgage loans. We expect that the residential
> mortgage loans will be non-conforming due to non-credit factors including, but
> not limited to, the fact that the (i) mortgage loan amounts exceed the maximum
> amount for such mortgage loan to qualify as a conforming mortgage loan, and (ii)
> underwriting documentation for the mortgage loan does not meet the criteria for
> qualification as a conforming mortgage loan. Non-conforming residential
> mortgage loans may have a higher risk of delinquency and foreclosure and losses
> than conforming mortgage loans. We may realize credit losses on our investment
> in non-conforming residential mortgage loans and RMBS backed by non-
> conforming residential mortgage loans.

(2006 10-K at 20.)

---

[6] KKR Financial's 2005 10-K states, "[w]e do not currently invest in sub-prime or non-prime mortgage loans or
mortgage-backed securities, although we may do so in the future." (KKR Financial Corp. 2005 Form 10-K ("2005
Form 10-K") at 2, Chepiga Decl., Ex. N.) The company's 2005 and 2006 10-Ks both caution that, "[i]n the future
we may invest in RMBS backed by non-prime or sub-prime residential mortgage loans which are subject to higher
delinquency, foreclosure and loss rates than prime residential mortgage loans which could result in losses to us."
(Id. at 26; 2006 10-K at 20.)

A majority of KKR Financial's investments were financed through the ABCP market. (Am. Compl. ¶ 24.)  The company would issue short-term debt instruments called "asset-backed secured liquidity notes," pledging its RMBS and residential mortgage loans as collateral.  (Id.; 2006 10-K at F-22-23.)   In 2005 and 2006, KKR Financial created two asset-backed secured liquidity note facilities (the "Facilities" or "ABCP Facilities") that issued short-term notes secured by KKR Financial's RMBS and residential mortgage loans.  (Id. ¶¶ 24-25; 2006 10-K at F-22-23.)  The company's 2005 10-K disclosed that:

> On September 30, 2005, we closed a $5.0 billion asset-backed secured liquidity note facility.  This facility provides us with an alternative source of funding our residential mortgaged-backed securities by issuing asset-backed secured liquidity notes that are rated A-1+, P-1, and F1+, by Standard and Poor's, Moody's and Fitch Inc, respectively.  Issuance of asset-backed secured liquidity notes are recorded as borrowings on our Consolidated Balance Sheet.  At December 31, 2005, we had $2.0 billion of asset-backed secured liquidity notes outstanding.

(2005 10-K at 62; Am. Compl. ¶ 25.)

KKR Financial's 2006 10-K explains that as of December 31, 2006, the secured liquidity note facility which closed on September 30, 2005 had $4.7 billion of asset backed secured liquidity notes outstanding.  (2006 10-K at 65; Am. Compl. ¶ 25.)  The 2006 10-K also disclosed that:

> On March 30, 2006, we closed our second $5.0 billion asset-backed secured liquidity note facility.  This facility provides us with an alternative source of funding our investments in residential mortgage-backed securities by issuing asset-backed secured liquidity notes that are rated A-1+, P-1, and F1+, by Standard & Poor's, Moody's and Fitch, Inc, respectively.  Issuances of asset-backed secured liquidity notes are recorded as borrowings on our Consolidated Balance Sheets.  At December 31, 2006, we had $4.0 billion of asset-backed secured liquidity notes outstanding under this facility.

(2006 10-K at 65; Am. Comp. ¶ 25.)

As of December 31, 2006, the $8.7 billion of outstanding ABCP issued by the Facilities was secured by approximately $9.0 billion of RMBS and residential mortgage loans held by KKR Financial.  (Am. Compl. ¶ 24; 2006 10-K at F-22-23.)  Plaintiff alleges that the descriptions of the Facilities in KKR Financial's 2005 and 2006 Form 10-Ks "failed to apprise investors that the Company held a $200 million 'equity interest' in the Facilities that was subject to loss and that KFN could be liable for an additional $50 million of losses if KFN defaulted or delayed the repayment of its ABCP outstandings."  (Am. Compl. ¶ 26.)

At a meeting in late 2006, KKR Financial's board of directors explored the possibility of changing the company's business strategy.  (Registration Statement at 59.)  In order to obtain more favorable returns, the board considered increasing investments in non-real estate related assets.  (Id.)  Since KKR Financial was a REIT, however, an increase in non-real estate related assets would have required a commensurate increase in real-estate related assets.  (Id. at 62-63.)  On January 17, 2007, the board of directors voted in favor of seeking shareholder approval for a proposed "merger," "conversion transaction," and "merger agreement" (the "Reorganization").[7] (Id. at 61.)  Upon shareholder approval of the Reorganization, KKR Financial shareholders were to exchange one share of KKR Financial for one share of the recently formed KFN.  (Id. at 1.) The Reorganization would result in KKR Financial becoming a wholly-owned subsidiary of KFN, with KFN as the publicly traded company.  (Id. at 57.)   KFN was not to operate as a REIT, and so after the Reorganization, the Company would no longer be obligated to meet the real-estate assets and income requirements imposed on REITs.

---

[7] In the Amended Complaint, and throughout its briefing, Plaintiff refers to the Reorganization as a "merger." Defendants contend that the term "merger" is misleading.  While, in a technical sense, the transaction was a "merger," the term "reorganization" seems more appropriate.  And Plaintiff concedes that the transaction at issue was entered into "in order to effectuate a significant reorganization of [KKR Financial's] business . . ." (Mem. in Opp. to Mot. to Dismiss at 1.)  Regardless, any distinction between the two terms has no effect on the legal analysis.

KKR Financial announced the proposed reorganization on January 30, 2007.  (Jed Horowitz, KKR Financial to Sell Residential Mortgage Investments, Dow Jones Newswires, Jan. 30, 2007, Chepiga Decl., Ex. D.)  The announcement had no material impact on KKR Financial's stock price.  A day before the announcement, the stock closed at $27.40; the day of the announcement, the stock closed at $27.10.  (Yahoo! Finance, Historical Prices for KKR Financial Corp., Chepiga Decl., Ex. E.)

On April 2, 2007, KFN filed a Form S-4/A with the SEC (the "Registration Statement").[8] The Registration Statement, which became effective the day it was filed, asked KKR Financial shareholders to approve the Reorganization.  (Registration Statement at 1; Am. Compl. ¶ 30.)[9] Under the heading, "Our Reasons for the Conversion Transaction and the Merger," the Registration sets forth the advantages and disadvantages presented by the Reorganization. (Registration Statement at 62-63.)  One of the listed advantages is,

> that the conversion transaction is expected to provide us with additional flexibility to allocate our capital, including reducing, or eliminating, our real estate investments which we are currently required to hold to maintain our qualification as a REIT and which have lower [returns on equity] than our non-real estate investments.

(Id. at 62.)

The Registration Statement describes how the Reorganization will affect the Company's business and operations.  (Id. at 53; Am. Compl. ¶ 32.)  It states that the Reorganization will provide the Company with the flexibility to reallocate capital to non-real estate investments which may be more lucrative.  (Registration Statement at 53; Am. Comp. ¶ 32.)  It explains that "[w]e are evaluating various alternatives to reducing our real estate investments after the

---

[8] The Registration Statement included a proxy statement (because it was being used to solicit proxies to, among other things, "approve the merger") and a prospectus (because KFN was offering shares in exchange for KKR Financial shares "if the merger is completed").  (Registration Statement at 1.)

[9] The Amended Complaint quotes, at length, from the Registration Statement, with little or no explanation of the relevancy of the quoted passages.

conversion transaction, including allowing our real estate assets to pay down in the ordinary course, selling KKR Financial Corp. or selling all or a portion of KKR Financial Corp.'s real estate assets." (Registration Statement at 54; Am. Compl. ¶ 32.) Assuming KFN chose to allow its real estate assets to liquidate in the ordinary course, the Registration Statement notes that "we expect that the reallocation of capital will occur over three or four years as our residential real estate investments pay down as a result of both scheduled amortization and prepayments." (Id.) The Registration statement cautions that the sale of KKR Financial's "real estate assets will result in a loss. As of December 31, 2006, the carrying value of our real estate assets exceeded the estimated fair value for those real estate assets by $49.9 million." (Id.)

Under the heading "Secured Liquidity Note Subsidiaries," the Registration Statement provides:

> KKR Financial Corp. has established two asset-backed secured liquidity note facilities. These facilities provide us with an alternative source of funding our RMBS by issuing asset-backed secured liquidity notes that are rated A-1+, P-1, and F1+, by Standard and Poor's, Moody's and Fitch, Inc., respectively, through special purpose trust subsidiaries. The subsidiaries that have issued secured liquidity notes will remain subsidiaries of KKR Financial Corp. after the conversion transaction.

(Registration Statement at 57; Am. Compl. ¶ 33.)

KKR Financial's 2006 Form 10-K, with its description of the Facilities, is incorporated by reference into the Registration Statement. (Registration Statement at 150; Am. Compl. ¶ 34.) The 2006 Form 10-K makes various representations about KKR Financial's business and operations, including representations regarding the value of KKR Financial's real-estate assets. (Am. Compl. ¶ 34.) As noted in the Amended Complaint, the 2006 Form 10-K states that "[a] material portion of our residential [adjustable rate mortgage] loans are non-conforming mortgage loans, not due to credit quality, but because the mortgage loans have balances that exceed the

maximum balances necessary to qualify as a conforming mortgage loan."  (Id.; 2006 Form 10-K at 57.)

The Registration Statement also incorporates various KKR Financial financial statements (the "Financial Statements"), including: KKR Financial's audited consolidated balance sheets as of December 31, 2005 and 2006 (with related consolidated statements of operations, changes in stockholders' equity, and cash flows for 2004 though 2006) and KKR Financial's unaudited consolidated balance sheet as of March 31, 2007 (with related consolidated statements of operations, changes in stockholders' equity, and cash flows for the three months leading up to March 31, 2007).  (Am. Comp. ¶¶ 44-45.)  The Registration Statement represents that the Financial Statements were prepared in conformity with GAAP.  (Id. ¶ 46.)

### i. Risk Factors Disclosed In Registration Statement

While completely ignored in the Amended Complaint, the Registration Statement contains 29 pages of "Risk Factors."  (Registration Statement at 19-47.)  Among numerous other risks, the Registration Statement discloses that "[a]ll, or a significant portion, of our investment portfolio is invested in non-agency RMBS and non-conforming residential mortgage loans."  (Id. at 34.)  The Registration Statement explains that "non-agency RMBS" and "non-conforming residential mortgage loans" may have higher risks of loss and delinquency than agency RMBS and conforming mortgage loans.  (Id. at 35.)  After stating that "[m]any of our investments are illiquid and we may not be able to vary our portfolio in response to changes in economic and other conditions," the Registration Statement states that,

> [a] majority of the mortgage-backed securities that we purchase are traded in private, unregistered transactions and are therefore subject to restrictions on resale or otherwise have no established trading market.  As a result, our ability to vary our portfolio in response to changes in economic and other conditions may be relatively limited.  In addition, if we are required to liquidate all or a portion of

our portfolio quickly, we may realize significantly less than the value at which we have previously recorded our investments.

(Id. at 38-39.)

The Registration Statement discloses the Company's reliance on the availability of adequate financing.  (Id. at 29.)  It states that "[f]ailure to obtain adequate capital and financing would adversely affect our results and may, in turn, negatively affect the market price of our shares and our ability to make distributions to holders of our shares."  (Id.)  The fact that the Company's assets were leveraged through the issuance of asset-backed secured liquidity notes is also disclosed.  Under the heading, "[w]e leverage our portfolio investments, which may adversely affect our return on our investments and may reduce cash available for distribution," the Registration Statements provides:

> We expect to leverage our portfolio investments through borrowings . . . . Our return on our investments and cash available for distribution to our stockholders may be reduced to the extent that changes in market conditions cause the cost of our financing to increase relative to the income that can be derived from the assets acquired.  Our debt service payments reduce cash flow available for distributions to holders of our shares.  We may not be able to meet our debt service obligations and, to the extent that we cannot, we risk the loss of some or all of our assets to foreclosure or sale to satisfy our debt obligations.  We leverage certain of our investments through repurchase agreements, total rate of return swaps and asset-backed secured liquidity notes.  A decrease in the value of the assets may lead to margin calls that we will have to satisfy.  We may not have the funds available to satisfy any such margin calls.

(Id.)

Under the heading "[d]eclines in the market values of our investments may adversely affect periodic reported results and credit availability, which may reduce earnings and, in turn, cash available for distribution to holders of our shares," the Registration Statement further provides:

> A decline in the market value of our assets may adversely affect us particularly in instances where we have borrowed money based on the market

value of those assets.  If the market value of those assets declines, the lender may require us to post additional collateral to support the loan.  If we were unable to post the additional collateral, we would have to sell the assets at a time when we might not otherwise chose to do so. . . .

Further, credit facility providers may require us to maintain a certain amount of cash invested or to set aside unlevered assets sufficient to maintain a specified liquidity position which would allow us to satisfy our collateral obligations.  As a result, we may not be able to leverage our assets as fully as we would choose, which could reduce our return on equity.  In the event that we are unable to meet these contractual obligations, our financial condition could deteriorate rapidly.

(Id. at 31-32.)

Finally, the Registration Statement discloses that a real or perceived decline in the value of the Company's asset-backed securities might cause a disruption in the Company's ability to obtain financing in the ABCP market.  (Id. at 36-37.)  The Registration Statement reads:

**Asset-backed securities are subject to credit risks that may arise due to defaults by the borrowers in the underlying collateral or the issuer's or servicer's failure to perform and other risks.**

We invest in investment grade and non-investment grade asset-backed securities, or ABS.  Investments in ABS bear various risks, including credit risk, interest rate risk, market risk, liquidity risk, operations risk, structural risk and legal risk. . . .

Liquidity risk may arise from an increase in perceived credit risk. Liquidity can also become a major concern for asset-backed commercial paper programs.  For example, concerns about credit quality may lead buyers to avoid the commercial paper issued by the relevant special-purpose entity.

(Id.)

On May 3, 2007, the Reorganization proposed in the Registration Statement was put to a vote at KKR Financial's annual shareholder meeting.  (Am. Compl. ¶ 30.)  The shareholders voted in favor of the proposal and the Reorganization was completed the following day with KFN exchanging 80.5 million of its shares for the same number of KKR Financial Shares.  (Id.)

On May 4, 2007, the day of the share exchange, KFN shares closed at $26.90, "giving the merger a value of $2.15 billion."  (Id. ¶ 4.)

KFN was established as a publicly traded holding company, with KKR Financial as one of its operating subsidiaries.  (Id. ¶ 23.)  Shareholders had substantially the same voting rights before and after the Reorganization, (Registration Statement at 110), and Plaintiff explains that "[t]he [m]erger had little substantive impact on the investment activities of . . . [KFN's] subsidiaries and SIVs [structured investment vehicles]."  (Am. Compl. ¶ 23.)  KKR Financial's board of directors continued to serve as the board of KFN.  The management company that managed KKR Financial continued to manage KFN without any changes to the economic terms of the management agreement.  (Registration Statement at 10, 73-80.)  In sum, what changed as a result of the Reorganization was the organizational structure and legal form of the Company. The KFN shares held by former KKR Financial shareholders represented the same assets, liabilities and rights as before the Reorganization.

### ii.      Problems with ABCP and RMBS Markets

Plaintiff alleges that at the time of the Reorganization, trouble was brewing in the ABCP and RMBS markets.  According to the Amended Complaint, "[b]y the time of the Merger, the markets for KFN's ABCP were deteriorating and KFN faced increasing liquidity risk regarding its ability to sell its portfolio of non-agency mortgage assets and increasing refinancing risks as conservative ABCP investors reduced their exposure to ABCP secured by real estate assets because of their concern over the value of the collateral."  (Am. Compl. ¶ 27.)  Plaintiff asserts that these risks were only addressed in the "most boilerplate fashion" in the Registration Statement.  (Id.)

When the Reorganization took place, the ABCP market had been in existence for approximately twelve years.  (Id. ¶ 28.)  During the first half of 2007, the total commercial paper market, inclusive of unsecured and secured commercial paper, stood at $2.2 trillion.  (Id.)  ABCP comprised approximately 50% of the market.  (Id.)  According to the Amended Complaint, prior to and at the time of the Reorganization, the asset-backed secured liquidity notes issued by KKR Financial were "extendible maturity notes."  (Id.)  Plaintiff states that the market for extendible maturity notes was "much narrower" than the overall ABCP market, with "[o]nly about 15% of the ABCP market [being] comprised of notes with extendible maturities."  (Id.)  Since the total market for "extendible ABCP" was approximately $170 billion, "KFN's ABCP outstandings of $8 billion comprised a material amount of that market at 4-5%."  (Id.)  Asserting that "investors in ABCP viewed extendible ABCP as the most risky segment of the commercial paper market and historically demanded higher returns for those investments," Plaintiff concludes that "[i]n times of market turmoil, as existed at the time of the Merger, borrowers, such as KFN, who heavily relied on that segment of the market for short-term financing, were especially susceptible to refinancing risks as risk adverse investors, such as money market funds, turned to more conservative investments for their short term needs."  (Id.)  Plaintiff alleges that "[t]he Registration Statement provided no discussion or description of KFN's participation in this narrow segment of the ABCP markets or of the increasing refinancing risk that KFN faced as investors in ABCP secured by real estate began to reduce their investments in extendible maturity ABCP notes."  (Id.)

According to Plaintiff, the illiquidity of KKR Financial's "jumbo" and "no-doc" mortgages, in conjunction with market conditions at the time of the Reorganization, created additional risks for the Company.  Plaintiff asserts that investors in ABCP are "highly risk

adverse." (<u>Id.</u> ¶ 29.)  According to the Amended Complaint, at the time of the Reorganization, investors in ABCP "were reassessing their ABCP positions in light of the subprime mortgage crisis and questions concerning the true value of the mortgage assets pledged in support of ABCP.  This brought into question that, if KFN were unable to refinance its $8 billion in ABCP outstandings, whether it could sell-off its mortgage assets in an orderly market." (<u>Id.</u>)  Plaintiff maintains that the Company's position was particularly precarious in light of the collateral backing its ABCP: "highly illiquid non-agency jumbo and no doc mortgage loans." (<u>Id.</u>)

The Amended Complaint states that at the time of the Reorganization, home prices had been declining for two years and interest rates were being raised "on jumbo mortgages due to the sensitivity these homes experienced in periods of declining home prices." (<u>Id.</u>)  The Company, along with other "jumbo" mortgage holders "had to rely on unregulated and non-agency sources to find buyers for these assets." (<u>Id.</u>)  The market, according to Plaintiff, was becoming "more and more unstable as the subprime crisis took hold." (<u>Id.</u>)  Plaintiff alleges that "Defendants were aware" that the Company's "use of ABCP to fund $8 billion of its mortgage investments was dependent on KFN's ability to quickly sell its jumbo mortgage investments or extend the maturity on its outstanding ABCP, a step which had never been taken by an ABCP issuer." (<u>Id.</u>)  The rising liquidity risks in the jumbo mortgage market made "the prospect of an extension or default on KFN's ABCP . . . much more than remote." (<u>Id.</u>)  According to the Amended Complaint, "[t]he Registration Statement failed to address KFN's increasing liquidity risks in light of the subprime crisis and resulting deterioration in the secondary market for jumbo mortgage sales." (<u>Id.</u>)

### iii.     Financial Statements

Plaintiff also contends that the Financial Statements incorporated in the Registration Statement "were each materially inaccurate in that they negligently failed to report facts required to be disclose[d] pursuant to GAAP."  (Id. ¶ 46.)  According to Plaintiff, "the probability of losses embedded in KFN's investment and leveraged debt strategies at the time of the Merger was not remote."  (Id. ¶ 50.)  Thus, "GAAP required the Company to disclose in its financial statements such potential risk of loss to investors in the form of a description of the nature of the contingent liability.  KFN's failure to do so constitutes a violation of its duty to disclose information required by GAAP."  (Id.)

### iv.     The August, 2007 Release and Subsequent Events

On August 15, 2007 – four months and thirteen days after the Registration Statement became effective and three months and twelve days after KKR Financial shareholders voted in favor of the Reorganization – KFN "shocked the financial markets" when it issued a release announcing that it had sold $5.1 billion in residential mortgage assets at a loss and was facing other potential losses.  (Id. ¶ 38; KFN Form 8-K filed August 15, 2007 ("Form 8-K"), Chepiga Decl., Ex. M.)  The release stated:

> KKR Financial Holdings LLC (NYSE: KFN) ("KFN" or the "Company") today announced the sale of approximately $5.1 billion of residential mortgage loans. Prior to the Company's conversion from a real estate investment trust ("REIT") to a limited liability company in May 2007, KFN invested in residential real estate assets in order to satisfy the requirements to be treated as a REIT for U.S. federal income tax purposes.  As a REIT, at least 75% of the Company's gross income had to be generated by real estate assets, which for the Company consisted of its investments in residential mortgage assets.  In order to meet this requirement, the Company sought to limit its exposure to both interest rate risk and credit risk by investing in floating rate and hybrid rate assets that were hedged with interest rate derivatives and by investing in residential mortgage assets with high credit quality due to the underlying collateral having a weighted average FICO® score of 728 and a weighted average loan-to-value ratio of 71%.

> As previously announced, the Company no longer intends to invest in residential real estate assets and it intends to dispose of its existing portfolio through either a run-off of the assets through principal payments and prepayments or through a strategic alternative, including actively pursuing the sale of the common stock of its REIT subsidiary.
>
> The Company recently sold $5.1 billion of its residential mortgage assets and terminated related interest rate swaps, which sale will result in a net loss of approximately $40.0 million.  After the sale, the Company owns approximately $5.8 billion of mortgage loans primarily in the form of residential mortgage-backed securities.  The Company currently finances approximately $5.3 billion of its remaining residential mortgage-backed securities portfolio through non-recourse asset-backed secured liquidity note facilities, and the Company currently has an aggregate net equity investment in such facilities totaling approximately $200.0 million.  Due to the unprecedented disruption in the residential mortgage and global commercial paper markets, the Company has initiated discussions with the investors in its asset-backed secured liquidity note facilities regarding various alternatives to resolve potential funding disruptions resulting from the current market environment.  In connection with the execution of or failure to execute any of the strategies discussed in this press release, the Company presently estimates that it may need to record a charge of up to the amount of its approximately $200.0 million net equity investment in the asset-backed liquidity note facilities described above and additional liabilities in an estimated range of $0 to $50.0 million.  No assurance can be made that any of the strategies being evaluated by the Company will be successfully executed.  In light of the level of disruption and volatility in commercial paper and broader credit markets, estimates of potential exposure are necessarily subject to future revision.

(Am. Compl. ¶ 38; Form 8-K.)

A day before the release, KFN shares closed at $15.27.  The day of the release, KFN shares closed at $10.52, a decline of 31%.  (Am. Compl. ¶ 39.)  The Amended Complaint quotes from an August 16, 2007 Wall Street Journal article, which Plaintiff contends provides "additional insight into KFN's spectacular demise."  (Id. ¶ 40.)  The article states that "a KKR real-estate affiliate sought to delay repayment of $5 billion in short-term debt held by about 15 investors, including some money-market funds."  (Id.)  The sought after delay is described as "the biggest blowup to hit the market for commercial paper."  (Id.)   According to the article,

"[t]he repayment delay and related losses of up to $290 million amount to a black eye for KKR founders . . . ."  (Id.)

On August 21, 2007, KFN announced an offering of 16 million common shares to seven institutional investors at a price of $14.40 per share.  (Id. ¶ 41.)  The same day, KFN offered shareholders the right to purchase up to 18.75 million additional common shares at the same price.  The rights offering was, however, undersubscribed and KFN insiders agreed to purchase 3.9 million shares.  (Id.)  The Amended Complaint states that the two offerings raised $500 million in "badly needed capital and further diluted former KKR Financial shareholders [sic] interests."  (Id.)

Throughout the remainder of 2007 and through 2008, KFN continued to incur losses "stemming from its highly leveraged investment strategies."  (Id. ¶ 42.)  On March 13, 2009, the date the Amended Complaint was filed, KFN common shares were trading at $0.45 per share.[10] (Id. ¶ 43.)

The Amended Complaint lists seven "true facts" which were omitted from the Registration Statement:

> (a) The non-agency-backed mortgage investments held by KFN were a much greater risk to the Company than the Registration Statement represented, especially in light of the sub-prime mortgage crisis, which had emerged and taken hold of markets by mid-2006;

> (b) The Company failed to adequately record loss reserves for its mortgage-related exposure, causing its balance sheet and financial results to be artificially inflated;

> (c) KFN's investment exposure to non-agency-backed mortgage assets was much greater than investors were led to believe by the Registration

---

[10] The Amended Complaint also states that as of the date it was filed, KFN shares traded at approximately $10. (Am. Compl. ¶ 39.)  It is unclear whether Plaintiff is referring to different classes of securities, but online trading data shows that KFN common stock closed at $0.42 on March 12, 2009 and $0.60 on March 13, 2009.  As of April 14, 2010, the KFN common stock was trading at approximately $9.

Statement's description of these investments as merely a "material" component of the Company's real-estate-related investments;

(d) The declining marketability of KFN's investments in mortgage loans and securities at the time of the Merger was limiting KFN's ability to purchase and refinance its investments in the short-term credit markets, including the ABCP markets;

(e) KFN was exposed to more than $245 million in potential losses, which the Company would incur if KFN was unable to refinance or repay its ABCP notes;

(f) KFN's financial statements had [not] been prepared in conformity with GAAP; and

(g) The Company's ABCP notes were issued with "extendible" maturity dates, which further reduced KFN's ability to refinance the debt in markets already shaken by the sub-prime crisis.

(Id. ¶ 36.)

**B.    Motion to Dismiss**

In considering a Fed. R. Civ. P. 12(b)(6) motion to dismiss, the Court assumes all facts alleged in the complaint are true, and draws all reasonable inferences in favor of the plaintiff. Kassner v. 2nd Ave. Delicatessen Inc., 496 F.3d 229, 237 (2d Cir. 2007).  Recitation of the "elements of a cause of action, supported by mere conclusory statements, do not suffice. . . . While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations."  Ashcroft v. Iqbal, __ U.S. __, 129 S.Ct. 1937, 1949-50 (2009).  To avoid dismissal, the complaint must contain "enough facts to state a claim to relief that is plausible on its face," that is to say, facts that "nudge[] [the plaintiff's] claims across the line from conceivable to plausible . . . ."  Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007). Plausibility, in turn, requires only that the allegations in the complaint "raise a reasonable expectation that discovery will reveal evidence" in support of the claim.  Id. at 556; see also Arar v. Ashcroft, 585 F.3d 559, 617 (2d Cir. 2009).

### i. Section 11

Section 11 "was designed to assure compliance with the disclosure provisions of the
[Securities] Act by imposing a stringent standard of liability on the parties who play a direct role
in a registered offering." Kronfeld v. Trans World Airlines, Inc., 832 F.2d 726, 734-35 (2d Cir.
1987) (quoting Herman & MacLean v. Huddleston, 459 U.S. 375, 381-82 (1983)).  To state a
viable Section 11 claim, the plaintiff must allege that: "(1) she purchased a registered security,
either directly from the issuer or in the aftermarket following the offering; (2) the defendant
participated in the offering in a manner sufficient to give rise to liability under section 11; and
(3) the registration statement 'contained an untrue statement of a material fact or omitted to state
a material fact required to be stated therein or necessary to make the statements therein not
misleading.'" In re Morgan Stanley Info. Fund Sec. Litig., 592 F.3d 347, 358-59 (2d Cir. 2010)
(quoting 15 U.S.C. § 77k(a)).[11]  Securities issuers "are subject to 'virtually absolute' liability
under section 11, while the remaining potential defendants under section[] 11 . . . may be held
liable for mere negligence." Id. at 359 (quoting Huddleston, 459 U.S. at 382); see also
Greenapple v. Detroit Edison Co., 618 F.2d 198, 203 (2d Cir. 1980) ("Section 11 . . . imposes a
form of strict liability for material misstatements or omissions of fact in registration
statements.").[12]

There are three potential bases of liability under Section 11: "(1) a misrepresentation; (2)
an omission in contravention of an affirmative legal disclosure obligation; and (3) an omission of
information that is necessary to prevent existing disclosures from being misleading." In re
Morgan Stanley, 592 F.3d at 360 (citing 15 U.S.C. § 77k(a)).  The truth of a statement made in

---

[11] Section 11 imposes liability on issuers, and among others, directors, underwriters and signatories to the
registration statement, "[i]n case any part of the registration statement, when such part became effective, contained an
untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to
make the statements therein not misleading . . . ." 15 U.S.C. § 77k(a).
[12] Non-issuer defendants are afforded several defenses based on due diligence.  See 15 U.S.C. § 77k(b).

19

the registration statement "is adjudged by the facts as they existed when the registration statement became effective." In re Flag Telecom Holdings, Ltd. Sec. Litig., 308 F. Supp. 2d 249, 254 (S.D.N.Y. 2004); see also 15 U.S.C. § 77k(a) (defining liability "[i]n case any part of the registration statement, when such part became effective," falls into one of these three categories); Lin v. Interactive Brokers Group, Inc., 574 F. Supp. 2d 408, 421 (S.D.N.Y. 2008) ("To be actionable under Section 11, the registration statement must contain an untruth or material omission 'when such part became effective.'" (quoting 15 U.S.C. § 77k(a))).  As such, the relevant inquiry "is not whether . . . [the statement] later turned out to be correct, but rather whether the [defendant] knew or had reason to know, at the time the offering documents were filed, that the statement was untrue." Zirkin v. Quanta Capital Holdings Ltd., No. 07 Civ. 851(RPP), 2009 WL 185940, at *10 (S.D.N.Y. Jan. 23, 2009).  Plaintiffs must, "at a minimum, plead facts to demonstrate that allegedly omitted facts both existed, and were known or knowable, at the time of the offering." Lin, 574 F. Supp. 2d at 421 (quoting Castlerock Mgmt. Ltd. v. Ultralife Batteries, Inc., 114 F. Supp. 2d 316, 323 (D.N.J. 2000)).  But see Hutchison v. CBRE Realty Fin., Inc., 638 F. Supp. 2d 265, 274 (D. Conn. 2009) ("Under current prevailing law, however, securities issuers do appear to be subject to strict liability with regard to material misstatements and omissions, regardless of whether the material omitted facts were known or knowable or not.").  The upshot is that plaintiffs are not allowed to plead Section 11 claims with the benefit of 20/20 hindsight. Yu v. State St. Corp., 686 F. Supp. 2d 369, 377 (S.D.N.Y. 2010) (Section 11 claim cannot be based on a "backward-looking assessment" of the registration statement), vacated on other grounds, No. 08 Civ. 8235, 2010 U.S. Dist. LEXIS 70931 (S.D.N.Y. July 14, 2010).

"A defendant is not required to disclose all known information, but has a duty to disclose any information that is 'necessary to make other statements not misleading.'" In re Alliance Pharm. Corp. Sec. Litig.,  279 F. Supp. 2d 171, 182 (S.D.N.Y. 2003) (quoting In re Donald J. Trump Casino Sec. Litig., 7 F.3d 357, 369 n.13 (3d Cir. 1993)).  The federal securities laws require issuers to chart a middle course, "'neither submerging a material fact in a flood of collateral data, nor slighting its importance through seemingly cavalier treatment.'" I. Meyer Pincus & Assocs. v. Oppenheimer & Co. & Co., 936 F.2d 759, 762 (2d Cir. 1991) (quoting Greenapple, 618 F.2d at 210).  Determining the materiality of a misstatement or omission entails asking "whether the defendants' representations, taken together and in context, would have misled a reasonable investor." In re Morgan Stanley, 592 F.3d at 360 (quoting Rombach v. Chang, 355 F.3d 164, 172 n.7 (2d Cir. 2004)); see also Oppenheimer, 936 F.2d at 761.  "An alleged misrepresentation or omission is material when there is a 'substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the "total mix" of information made available.'" In re Nokia OYJ (Nokia Corp.) Sec. Litig., 423 F. Supp. 2d 364, 393 (S.D.N.Y. 2006) (quoting Halpern v. eBanker USA.com, Inc., 295 F.3d 352, 357 (2d Cir. 2002)).  The task is not to parse the registration statement in an attempt to determine whether particular statements, taken separately, are true; instead, the registration statement must be read "'as a whole.'" DeMaria v. Andersen, 318 F.3d 170, 180 (2d Cir. 2003) (quoting Olkey v. Hyperion 1999 Term Trust, Inc., 98 F.3d 2, 5 (2d Cir. 1996)).  While the question of materiality is typically reserved for the fact-finder, dismissal as a matter of law is appropriate when the alleged misstatements or omissions "are so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of

21

their importance."  In re Morgan Stanley, 592 F.3d at 360 (quoting ECA v. JP Morgan Chase,

553 F.3d 187, 197 (2d Cir. 2009)).

### ii. Pleading Standard: Fed. R. Civ. P. 8(a)(2) or 9(b)

Defendants argue that the Amended Complaint is based on alleged fraudulent conduct

and therefore must meet the enhanced pleading standards of Rule 9(b), requiring fraud claims to

be pled with particularity.  See Fed. R. Civ. P. 9(b) ("In alleging fraud or mistake, a party must

state with particularity the circumstances constituting fraud or mistake.").  Of course, if fraud is

alleged in a Section 11 claim, it must be pled with particularity, but fraud is not an element of

Section 11 claims.  Accordingly, claims under Section 11 "are not automatically subject to

heightened pleading requirements . . . ."  In re Ambac Fin. Group, Inc. Sec. Litig., 693 F. Supp.

2d 241, 263 (S.D.N.Y. 2010).  And if a Section 11 claim does not sound in fraud, it is subject to

the general pleading requirements of Rule 8(a).  See In re Morgan Stanley, 592 F.3d at 358.

"Whether fraud is alleged depends on the 'conduct alleged, and is not limited to

allegations styled or denominated as fraud or expressed in terms of the constituent elements of a

fraud cause of action.'"  In re IAC/InterActiveCorp Sec. Litig., 695 F. Supp. 2d 109, 166

(S.D.N.Y. 2010) (quoting Rombach, 355 F.3d at 171).  "The touchstone inquiry is whether 'the

gravamen of the complaint is plainly fraud.'"  Id. (quoting Rombach, 355 F.3d at 172).

Boilerplate disclaimers of fraud will not do; the complaint's "gravamen is fraud if it alleges a

unified 'fraudulent scheme.'"  Id. (quoting In re Ultrafem, Inc. Sec. Litig., 91 F. Supp. 2d 678,

690 (S.D.N.Y. 2000)).

Defendants urge that Plaintiff's "[a]llegations of knowing omissions are classic

allegations of fraud."  (Mem. in Supp. Mot. to Dismiss at 14.)  There is only a single "knowing

omission," however, alleged in the Amended Complaint.  Plaintiff alleges that "[t]he

Registration Statement failed to address KFN's increasing liquidity risks in light of the subprime crisis and resulting deterioration in the secondary market for jumbo mortgage sales."  (Am. Compl. ¶ 29.)  In support of this allegation, the Amended Complaint states, "[a]s defendants were aware, KFN's usage of ABCP to fund $8 billion of its mortgage investments was dependent on KFN's ability to quickly sell its jumbo mortgage investments or extend the maturity of its outstanding ABCP, a step which had never been taken by an ABCP issuer."  (Id.)

Plaintiff's allegation that Defendants were "aware" of the risks involved in KFN's mode of financing is miles away from alleging fraudulent conduct.  Nor does the Amended Complaint intimate that the alleged omissions from the Registration Statement were made with fraudulent intent.  Instead, the "gravamen" of the Amended Complaint is "plainly" negligence.  Rule 9(b) does not apply and the Amended Complaint will be tested under the pleading requirements of Rule 8(a).

## C.      Plaintiff's Concessions and Focus on Two Arguments

The Amended Complaint lists seven "omissions" from the Registration Statement.  (Am. Compl. ¶¶ 5, 36; see supra p. 17-18.)  These seven omissions can be grouped into three interconnected and overlapping categories: (1) failure to fully disclose the risks attendant to KFN's investments in non-conforming mortgages and non-agency RMBS; (2) failure to fully disclose the risks inherent in KFN's reliance on the ABCP market for financing; and (3) failure to disclose accounting errors with respect to loss reserves.  (Id.)  In light of the alleged omissions, Plaintiff maintains that "[t]he Registration Statement issued in connection with the Merger was negligently prepared and, as a result, contained untrue statements of material facts,

omitted to state other facts necessary to make the statements made not misleading and was not prepared in accordance with the rules and regulations governing its preparation."  (Id. ¶ 5.)[13]

Plaintiff apparently concedes that a number of the omissions set forth in the Amended Complaint are not actionable.  In responding to the motion to dismiss and at oral argument, Plaintiff argues against dismissal on only two alleged "omissions."  (Tr. 7:17-8:8 (Oct. 5, 2010).) First, Plaintiff contends that the Registration Statement omitted material facts regarding the ABCP Facilities, the "key" omitted fact being "that KFN had retained at-risk investments in the ABCP facilities of at least $200 million that was subject to loss if the facilities could not continue to perform as expected."  (Mem. in Opp. to Mot. to Dismiss at 9.)  Second, Plaintiff argues that the financial statements incorporated into the Registration Statement were not prepared in accordance with GAAP.  More specifically, Plaintiff contends that "[g]iven that the probability of losses embedded in KFN's investment and leveraged debt strategies at the time of the Merger was not remote, GAAP required the Company to disclose in its financial statements such potential risk of loss to investors in the form of a description of the nature of the contingent liability."  (Id. at 12.)

## D.   The ABCP Facilities

The Amended Complaint alleges that the Registration Statement failed to disclose that: (1) "[t]he declining marketability of KFN's investments in mortgage loans and securities at the time of the Merger was limiting KFN's ability to purchase and refinance these investments in the

---

[13] While, at the fringes, the distinction between making a "misrepresentation" and omitting "information that is necessary to prevent existing disclosures from being misleading" is subtle at best, most of the alleged untruths set forth in the Amended Complaint fall within the latter category.  Yet, by stating that the Registration Statement "was not prepared in accordance with rules and regulations governing its preparation," the Amended Complaint seems to intimate that the Defendants omitted information "in contravention of an affirmative legal disclosure obligation."  In re Morgan Stanley, 592 F.3d at 360.  Plaintiff does not, however, point to any specific rule or regulation requiring inclusion of the allegedly omitted information.  And it is Plaintiff's burden to show that the Registration Statement contains omissions in violation of legal disclosure obligations.  See In re Giant Interactive Group, Inc. Sec. Litig., 643 F. Supp. 2d 562, 568 (S.D.N.Y. 2009); In re Ultrafem Inc. Sec. Litig., 91 F. Supp. 2d 678, 695 (S.D.N.Y. 2000).

short-term credit markets, including the ABCP markets," (2) "KFN was exposed to more than $245 million in potential losses, which the Company would incur if KFN was unable to refinance or repay its ABCP notes," and (3) "[t]he Company's ABCP notes were issued with 'extendible' maturity dates, which further reduced KFN's ability to refinance the debt in markets already shaken by the subprime crisis."  (Am. Compl. ¶ 5.)

Defendants argue that these alleged omissions all amount to pleading by hindsight.  They note that the Registration Statement must be judged based on the facts that existed as of April 2, 2007.  According to the Defendants, Plaintiff has not pled any facts indicating that there was a decline in the "marketability" of the Company's real estate investments as of April 2, 2007.  Moreover, the Amended Complaint fails to allege facts in support of Plaintiff's claim that the Company was having trouble financing its investments in the ABCP market as of April 2, 2007.  Defendants contend that Plaintiff has failed to plead facts showing that KFN's exposure to $245 million in losses in the ABCP market was knowable on April 2, 2007.  As for the "extendible maturity dates" of the secured liquidity notes, Defendants reiterate that Plaintiff has failed to plead facts showing that the Company "faced any difficulty in refinancing its extendible maturity notes at the time the Registration Statement was issued or that it knew of a significant risk that it could not refinance these notes in the future."  (Mem. in Supp. Mot. to Dismiss at 21.)

According to Plaintiff, "[t]hese arguments miss the point.  Plaintiff is not complaining that Defendants didn't predict the upcoming credit crisis; only that, given then prevailing economic conditions, the Registration Statement was required to disclose the true risks facing the Company due to its ABCP facilities."  (Mem. in Opp. to Mot. to Dismiss at 10.)  The "true risks" were that KFN's $200 million equity investment in the Facilities "was subject to loss if the

facilities could not continue to perform as expected" and that KFN faced "refinancing" and "liquidity" risks at the time of the Reorganization.  (Id. at 9-11.)

At oral argument, the Court asked Plaintiff to disclose the source of the $200 million figure in the Amended Complaint.  Counsel could not do so.  In a subsequent letter, dated October 12, 2010, counsel advised that the basis for the $200 million "was derived from KFN's August 15, 2007 press release."  The Amended Complaint is silent, however, as to how this disclosure was known as of 4 months earlier – at the time of the Registration Statement; or, indeed, how a subsequent event could have been known at an earlier time.  The Securities Law requires accuracy as to current facts, not omniscience as to future events.  In response to the Court's request at oral argument, counsel could not identify facts indicating that Defendants knew at an earlier time than August that they would be forced to sell assets quickly, and at a loss.

Since Plaintiff does not point to any affirmative legal obligation to disclose the alleged risks facing the Company when the Registration Statement became effective, the question is whether inclusion of the omitted information was necessary "to prevent existing disclosures from being misleading."  In re Morgan Stanley, 592 F.3d at 360.  Review of the Registration Statement and the facts alleged in the Amended Complaint reveals that the allegedly omitted risks did not render the existing disclosures regarding the ABCP Facilities misleading. Furthermore, the omission of KFN's $200 million interest in the Facilities was, as a matter of law, immaterial.  In light of this, Plaintiff has failed to state a viable Section 11 claim based on the ABCP Facilities.

The ABCP Facilities are disclosed in the Registration Statement.  (Registration Statement at 57.)  After describing the Facilities, the Registration Statement explains that "special purpose trust subsidiaries . . . . that have issued secured liquidity notes will remain subsidiaries of KKR

Financial Corp. after the conversion transaction."  (Id.)  KKR Financial's 2006 10-K, which is incorporated by reference into the Registration Statement, also describes the Facilities and sets forth the amount of outstanding secured liquidity notes ($8.7 billion) and the collateral securing the notes (approximately $9 billion worth of RMBS and residential mortgage loans).  (2006 10-K at 65, F-22, F-23; Registration Statement at 150.)

The Registration Statement explains that the Company is heavily reliant on the availability of financing and that KFN "expect[s] to leverage [its] portfolio investments through borrowings."  (Registration Statement at 29.)  In light of this leverage, a decline in the market value of the Company's assets may require selling "assets at a time when we might not otherwise choose to do so."  (Id. at 31-32.)  And the Registration Statement cautions that if the Company is unable to meet its obligations to provide adequate collateral, its "financial condition could deteriorate rapidly."  (Id. at 32.)

The Registration Statement also explains that a real or perceived decline in the value of the Company's asset backed securities might seriously hinder operations.  It warns that "[l]iquidity can  . . . become a major concern for asset-backed commercial paper programs.  For example, concerns about credit quality may lead buyers to avoid the commercial paper issued by the relevant special-purpose entity." (Id. at 37.)

Plaintiff's allegations regarding the condition of the real estate and ABCP markets at the time of the Reorganization are conclusory, based on hindsight, and fail to support a plausible claim.  (See Am. Compl. ¶¶ 27-29.)  The Amended Complaint alleges that at the time of the Reorganization "the markets for KFN's ABCP were deteriorating and KFN faced increasing liquidity risk regarding its ability to sell its portfolio of non-agency mortgage assets and increasing financing risks as conservative ABCP investors reduced their exposure to ABCP

secured by real estate assets because of their concern over the value of the collateral." (Id. ¶ 27.)
Plaintiff, however, fails to provide factual support for this assertion.  As Defendants point out,
the Amended Complaint does not allege that KFN was experiencing difficulty financing its
investments though the ABCP market in April, 2007.  Nor does the Amended Complaint allege
that there were disruptions in the ABCP market prior to the effective date of the Registration
Statement.

    The Amended Complaint alleges that at the time of the Registration home prices had
been declining for two years and that the "subprime mortgage crisis" had taken hold.  (Id. ¶29.)
From these facts, Plaintiff extrapolates that when the Registration Statement became effective
"the prospect of an extension or default of KFN's ABCP became much more than remote."  (Id.)
This extrapolation is made only with the clarity that hindsight provides.  Again, Plaintiff has not
alleged facts showing that declining home prices and the "subprime mortgage crisis" had any
input on KFN's ability to sell its real estate assets or its ability to refinance its ABCP as of the
Registration Statement's effective date.  And Plaintiff has failed to allege facts – untainted by the
clear eyes of hindsight – which show that KFN's inability to refinance its ABCP in August, 2007
was "knowable" four months earlier when the Registration Statement became effective.  See Lin,
574 F. Supp. 2d at 421.

    Plaintiff also faults Defendants for failing to disclose that the asset backed secured
liquidity notes issued by KFN were "extendible maturity notes."  (Am. Compl. ¶ 28.)  According
to the Amended Complaint, "[f]rom a risk perspective, investors in ABCP viewed extendible
ABCP as the most risky segment of the commercial paper market and historically demanded
higher returns for those investments."  (Id.)  Plaintiff maintains that the Company's issuance of
extendible maturity notes "further reduced KFN's ability to refinance its debt in markets already

shaken by the subprime crisis." (Id. ¶ 5.)  As noted, however, the Amended Complaint fails to allege facts showing that KFN was experiencing difficulty refinancing its ABCP in April, 2007. And besides Plaintiff's vague allegations concerning declining home prices and the subprime crisis, the Amended Complaint does not allege any facts showing that in April, 2007 it was "knowable" that KFN would have future difficulty refinancing its commercial paper.

Moreover, the risks presented by KFN's mode of financing were clearly disclosed in the Registration Statement.  The Registration Statement not only discloses the existence of the ABCP Facilities, but it also discloses that a decline in the value of KFN's real estate investments might severely hamper the Company's ability to obtain financing through the ABCP market. KFN's inability to obtain financing, the Registration Statement explains, might in turn cause a rapid deterioration in KFN's financial condition, resulting in significant losses.  Defendants were not required to disclose "all known information." In re Alliance Pharm., 279 F. Supp. 2d at 182. Rather, they were required to disclose "any information . . . 'necessary to make other statements not misleading.'" Id.  Defendants' failure to disclose that KFN's asset backed secured liquidity notes had extendible maturity dates did not render the Registration Statement's cautionary statements regarding the financing risks faced by KFN misleading.

Finally, Plaintiff argues that KFN's $200 million equity interest was a "key fact" that should have been disclosed in the Registration Statement.  Plaintiff relies on Credit Suisse First Boston Corp. v. ARM Fin. Group, Inc., No. 99 CIV 12046(WHP), 2001 WL 300733 (S.D.N.Y. Mar. 28, 2001), but that case does not bear the weight of Plaintiff's argument.

The plaintiffs in Credit Suisse brought a Section 11 claim alleging that ARM Financial Group's registration statement "painted a picture of a company that was far less risky than was, in fact, the case." Id. at *5.  The plaintiffs claimed, among other things, that the registration

statement failed to disclose that certain investment products sold by the ARM could be redeemed with as little as seven days' notice. Id. at *2. Denying the defendants' motion to dismiss, the Court held that "at least at the pleading stage, plaintiffs adequately allege that the omission that funding agreements and GICs could be put to ARM on seven days notice failed to warn investors of the magnitude of the risk associated with the Company's institutional spread business." Id. at *9.

Plaintiff likens its case to Credit Suisse and argues that "Defendants' failure to disclose that KFN was in a first loss position of $200 million on its ABCP facilities failed to warn investors of the 'magnitude of risk' associated with the Company's ABCP facilities." (Mem. in Opp. to Mot. to Dismiss at 10). Credit Suisse, however, involved a failure to disclose the degree of risk inherent in the securities issuer's business, not simply failing to place a dollar amount on an otherwise disclosed risk. Here, the Registration Statement clearly disclosed the risks posed by KFN leveraging its assets through the ABCP market. Indeed, the Registration Statement specifically discloses that a drop in the value of KFN's assets might require the Company to sell its "assets at a time when we might not otherwise choose to do so" and, further, that a decline in asset values could cause KFN's "financial condition [to] deteriorate rapidly." (Registration Statement at 32.) As in In re Xinhau Fin. Media, Ltd. Sec. Litig., No. 07 Civ. 3994(LTS)(AJP), 2009 WL 464934, at *8 (S.D.N.Y. Feb. 25 2009), when read as a whole, the Registration Statement does not suggest "that every conceivable possibility of a negative event would be discussed." Nor were Defendants required to disclose "every conceivable possibility of a negative event." Rather, "when defendants warn investors of a potential risk, they need not predict the precise manner in which the risks will manifest themselves." In re AES Corp. Sec. Litig., 825 F. Supp. 578, 588 (S.D.N.Y. 1993). A Registration Statement is not required to

predict the "precise manner" in which KFN's financing risk might manifest itself, so long as the risk itself is clearly disclosed. The Amended Complaint fails to allege sufficient facts linking the write-off of August, 2007 to "known" or "knowable" facts in existence when the Registration Statement was filed in April, 2007; in other words, this is pleading with 20/20 hindsight.

The Court also notes that the omission of KFN's $200 million equity interest in the Facilities is not material. When the Registration Statement became effective, KFN's balance sheet included over $17.5 billion in assets. (Registration Statement at 16.) KFN's interest in the Facilities therefore amounted to 1.1% of the Company's total assets. While in determining whether a misrepresentation or omission is material, percentages are not strictly controlling, Ganio v. Citizens Utilities Co., 228 F.3d 154, 162 (2d Cir. 2000), in light of the cautionary statements in the Registration Statement regarding the potential for catastrophe if KFN could not obtain financing, KFN's $200 million interest in the Facilities would be "so obviously unimportant to a reasonable investor that reasonable minds c[an] not differ on the question of [its] importance." In re Morgan Stanley, 952 F.3d at 360.

## E.    GAAP Violation

The Amended Complaint alleges that the Financial Statements incorporated into the Registration Statement were not prepared in accordance with GAAP. (Am. Compl. ¶ 5.) According to Plaintiff, Defendants' failure to comply with GAAP "rendered KFN's financial statements and the Registration Statement materially inaccurate." (Id. ¶ 51.)

According to Plaintiff, the Financial Statements failed to comply with Paragraph 10 of Statement of Financial Accounting Standards ("SFAS") No. 5. The Amended Complaint states that "[g]iven that the probability of losses embedded in KFN's investment and leveraged debt strategies at the time of the Merger was not remote, GAAP required the Company to disclose in

its financial statements such potential risk of loss to investors in the form of a description of the nature of the contingent liability."  (Id. ¶ 50.)

As an initial matter, Plaintiff's claim based on "the probability of losses embedded in KFN's investment and leveraged debt strategies" appears to be outside SFAS No. 5's definition of "loss contingency."  SFAS No. 5, ¶ 14, "General or Unspecified Business Risks," provides: "Some enterprises have in the past accrued so called 'reserves for general contingencies.' General or unspecified business risks do not meet the conditions for accrual in paragraph 8, and no accrual for loss shall be made.  No disclosure about them is required by this Statement." SFAS No. 5, ¶ 14.  Risks presented by general investment and financing "strategies" seem to fall within the purview of general business risks which do not need to be disclosed.

More importantly, a loss contingency is not simply a potential future loss.  Instead, SFAS No. 5 requires accrual or disclosure of a loss contingency when it is "probable" or "reasonably possible" that a loss has already been incurred.  See id. ¶¶ 8, 10; see also Zaluski v. United Am. Healthcare Corp., 527 F.3d 564, 576 (6th Cir. 2008); Schick v. Ernst & Young, 808 F. Supp. 1097, 1103 n.4 (S.D.N.Y. 1992).  The Amended Complaint does not allege facts indicating that there was a "reasonable possibility" that KFN had suffered a loss as of the effective date of the Registration Statement.  Instead, the Amended Complaint speaks in terms of "increasing refinancing risks" and "liquidity risks."  (Am. Compl. ¶¶ 27-29).  Based on these risks – which did not materialize until August, 2007 – Plaintiff assumes, without supporting factual allegations, that KFN must have suffered a loss in April, 2007.  This naked form of hindsight pleading, however, does not show that the Financial Statements violated SFAS No. 5 and fails to state a plausible Section 11 claim.  See In re Acceptance Ins. Cos. Sec. Litig., No. 8:99 CV 547, 2001 WL 34746493, at *5 (D. Neb. Mar. 2, 2001) (dismissing Section 11 claim based on alleged

violation of SFAS No. 5 and explaining that "with 20-20 hindsight, the Complaint simply

assumes that a loss resulting from the Montrose decision was probable and reasonably estimable

prior to the third quarter of 1999. Without the necessary factual allegations to support such

conclusions, the Complaint fails to state a claim upon which relief can be granted . . . .").

**F.    Section 15**

Section 15 "creates derivative liability for persons who control a Section 11 violator." In

re IAC/InterActiveCorp, 2010 WL 996483, at *5. Since there is no underlying Section 11 claim,

Plaintiff's Section 15 claim must be dismissed. Yu, 686 F. Supp. 2d at 374 ("[A] cause of action

under Section 15 for control person liability requires an underlying Section 11 . . . violation.")

<strong>Conclusion</strong>

For the foregoing reasons, Defendants' motion to dismiss the Amended Complaint is

GRANTED. The Clerk is directed to enter judgment and close this case.

Dated:  New York, New York
         November 17, 2010

SO ORDERED

PAUL A. CROTTY
United States District Judge